J-S04036-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAMIR K. WILLIAMS | : | |
| | : | |
| Appellant | : | No. 831 EDA 2025 |

Appeal from the PCRA Order Entered March 7, 2025
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0003682-2018

BEFORE:  LAZARUS, P.J., STABILE, J., and NEUMAN, J.

MEMORANDUM BY NEUMAN, J.:                    **FILED APRIL 7, 2026**

Appellant, Damir K. Williams, appeals from the post-conviction court's

March 7, 2025 order denying his timely-filed petition under the Post Conviction

Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546.  We affirm.

## Background

The PCRA court set forth the background of this case as follows:

I. PROCEDURAL BACKGROUND

On May 24, 2019, following a jury trial before this [c]ourt, [Appellant] was convicted of one count each of murder of the second degree (18 Pa.C.S. § 2502(b)), conspiracy to commit burglary (18 Pa.C.S. § 903[; 18 Pa.C.S. § 3502]), robbery (18 Pa.C.S. § 3701(a)(1)(i)),[1] and criminal trespass (18 Pa.C.S. § 3503(a)(1)(i)).   That same day, the [c]ourt imposed the mandatory sentence of life in prison without the possibility of parole for the second[-]degree murder conviction, and a consecutive sentence of 10 to 20 years['] incarceration for the conspiracy conviction.   There was no further penalty for the criminal trespass conviction.[2]  [Appellant] filed a post-sentence motion, which the [c]ourt denied on September 13, 2019.   On December 4, 2020, the Superior Court affirmed [Appellant's]

judgment of sentence. [**Commonwealth v. Williams**, 245 A.3d 1047 (Pa. Super. 2020) (unpublished memorandum)]. The Supreme Court of Pennsylvania denied *allocatur* on May 10, 2021. [**Commonwealth v. Williams**, 253 A.3d 215 (Pa. 2021)]. [Appellant] was represented at trial and on appeal by Gary Server, Esquire.

> [1] The victim for [Appellant's] second[-]degree murder and robbery convictions was Anthony Martella.

> [2] [Appellant's] robbery conviction merged with his conviction for second[-]degree murder for purposes of sentencing.

On November 29, 2021, [Appellant] filed a timely, *pro se* PCRA petition, which is here at issue. Mark Houldin, Esquire, entered his appearance as *pro bono* counsel for [Appellant] on December 28, 2021. On April 26, 2022, [Appellant] filed a ["]Motion for Court Order Directing Release of Medical Records["] for the victim in this case, Anthony Martella, which the [c]ourt granted on May 3, 2022. [Attorney] Houldin moved to withdraw as counsel on March 1, 2023, and, that same day, Michael Wiseman, Esquire, entered his appearance as privately retained counsel for [Appellant]. On August 6, 2023, [Appellant] filed an amended petition, and on April 26, 2024, [Appellant] filed a supplemental amended petition. On October 29, 2024, the Commonwealth filed a motion to dismiss. [Appellant] filed a response to the Commonwealth's motion to dismiss on December 11, 2024. On January 16, 2025, the [c]ourt issued a notice, pursuant to Pa.R.Crim.P. 907, of its intent to dismiss [Appellant's] PCRA petition without a hearing. The [c]ourt dismissed [Appellant's] PCRA petition on March 7, 2025. [Appellant filed a timely notice of appeal and timely complied with the court's directive to file a Pa.R.A.P. 1925(b) statement. The court thereafter issued a responsive Rule 1925(a) opinion.]

\*\*\*

## II. FACTUAL BACKGROUND

The factual background underlying [Appellant's] convictions was set forth in this [c]ourt's 1925(a) [o]pinion in [Appellant's] direct appeal as follows:

> At trial, the Commonwealth presented the testimony of Philadelphia police officers John Durkin, Barry Sudler,

Christopher Jones, and Matthew Lally[;] Philadelphia police detectives Michael Cannon, Michael Corson, Daniel Plaza, and Thorsten Lucke[;] Burlington County [M]edical [E]xaminer Dr. Ian Hood[;] Fred Martella[;] Brittney Rehrig[;] Andrea Williams[;] and co-defendant Mark McLaughlin.[1] [Appellant] presented the character testimony of Angel Santiago and Loretta Amons. Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence established the following:

> [1] At Docket No. CP-51-CR-0003681-2018, Mark McLaughlin pled guilty to one count each of murder of the third degree (18 Pa.C.S. § 2502(c)), conspiracy to commit murder of the third degree (18 Pa.C.S. § 903), and burglary (18 Pa.C.S. § 3502), regarding the burglary and murder here at issue. At Docket No. CP-51-CR-0003683-2018, McLaughlin pled guilty to one count of burglary (18 Pa.C.S. § 3502), regarding the previous burglary of the Martella home discussed in the text, *infra*.

Mark McLaughlin lived at 7330 Hill Road, next-door to 7332 Hill Road, where the decedent, Anthony Martella [(hereinafter "Mr. Martella")], lived with his sister, Rosemary Martella [(hereinafter, "Rosemary" or "Rosemary Martella")]. On February 16, 2017, McLaughlin broke into the Martella home looking for money to support his drug habit. As a result of that break-in, he was arrested and charged with burglary on May 1, 2017. He was held in prison awaiting trial, but was released on September 13, 2017, at 3:00 a.m. The charges had been dismissed, since Rosemary and [Mr. Martella] did not appear to testify.

On the very day he was released from prison, McLaughlin decided that he would break into the Martella home again. He met up with [Appellant], whom he had known for several years. McLaughlin told [Appellant] that he had previously burglarized the Martella home, and that they could do it again to get some money.

Around 5:00 a.m. that morning, [Appellant] and McLaughlin went to the back door of the Martella home. [Mr. Martella] answered the door and invited McLaughlin and [Appellant] in[to] the home. [Appellant] then choked [Mr. Martella] and jumped on top of him. McLaughlin and [Appellant] found

tape inside the home and [Appellant] tied [Mr. Martella] up while McLaughlin held him down. McLaughlin then went upstairs to Rosemary's bedroom to grab money. On the second floor, McLaughlin found Rosemary in her room and asked her for money. McLaughlin found and took a purse that contained $150, car keys, and some bank cards. McLaughlin and [Appellant] then left the home and used the car keys to take Rosemary's car. At some point[,] McLaughlin cut the phone lines using scissors.

Around 7:45 a.m., Rosemary went to the home of neighbor, off-duty police officer John Durkin. Rosemary told Officer Durkin that McLaughlin had gotten into her home again and had cut her phone line. Officer Durkin knew that McLaughlin had previously broken into the Martella home and that McLaughlin had been in prison for the break-in. Officer Durkin and Rosemary called her other brother, Fred Martella, and then started to call 911 when Rosemary told Officer Durkin that [Mr. Martella] was tied up in the basement. Officer Durkin and Rosemary then went into the Martella home. When they arrived, [Mr. Martella] was untied but kept rubbing his hands over his chest, was short of breath, and seemed increasingly uncomfortable. Officer Durkin had also noticed a broken lamp in the middle bedroom, tape on the basement floor at the bottom of the stairs, and that Rosemary's car was missing from her driveway.

Between 8:00 and 8:30 a.m., an ambulance arrived and took [Mr. Martella] to Roxborough Hospital. The same day, Detective Michael Cannon went to the hospital, but was unable to interview [Mr. Martella] because [Mr. Martella] was in too much pain. Detective Cannon received a phone call later that day that [Mr. Martella] had been transferred to Temple Hospital because he was in more serious condition than previously thought.

On September 18, 2017, McLaughlin was interviewed by detectives at the Northwest Detective Division. During the interview, McLaughlin admitted to entering the Martella home with [Appellant] on September 13, 2017, and stated that he saw [Appellant] hit, choke, and tie up [Mr. Martella].

Rosemary's car was found on Welsh Road in close proximity to McLaughlin's grandmother's house. Rosemary's purse,

- 4 -

taken from the second[-]floor bedroom of her home, was found inside the car. The car was dusted for fingerprints, revealing a fingerprint from [Appellant] on the passenger side door handle.

Prior to the break-in on September 13, 2017, Rosemary and [Mr. Martella] were in good health and able to live alone. Following the break-in, [Mr. Martella] was transported to Roxborough [H]ospital. He never regained his ability to speak and could no longer stand or walk. At [the h]ospital, he was put on a ventilator. After about two weeks, doctors performed a tracheostomy. [Mr. Martella] was unconscious and not able to swallow or eat, so a feeding tube was inserted. Once he could breathe on his own[,] he was transferred to a nursing home. Because he could not clear his airway by coughing or swallowing properly, he had episodes where we would aspirate secretions from his nose and mouth into his lungs, causing pneumonia.

Doctors determined that [Mr. Martella] had suffered a hypoxic brain injury, that is, brain injury caused by a lack of oxygen getting to the brain. The injury was permanent, and [Mr. Martella] had no chance to recover. After two or three episodes of aspiration pneumonia, his family made the decision to stop active treatment and for [Mr. Martella] to go into hospice care. He remained in a nursing home until he died on March 15, 2018, at the age of 76.

An autopsy was done on [Mr. Martella] by Dr. Ian Hood, a medical examiner for Burlington County and an expert in the field of forensic pathology. Dr. Hood determined that [Mr. Martella]'s immediate cause of death was pneumonia, but that the pneumonia was caused by the hypoxic brain injury that [Mr. Martella] had previously sustained during the burglary. Dr. Hood explained that the brain injury was [Mr. Martella]'s primary cause of death[,] as it was the cause of the pneumonia from which [Mr. Martella] ultimately died.

PCRA Court Opinion ("PCO"), 5/23/25, at 1-5 (internal citations omitted).

## **Issues**

On appeal, Appellant raises six issues for our review:

1. Was trial counsel ineffective for failing to secure the Roxborough Hospital medical records when said records were material to the question of causation in this delayed death prosecution and also could have been used to impeach the prosecution's trial narrative that the victim suffered injuries during the home invasion?

2. Was trial counsel ineffective for failing to introduce exculpatory DNA results?

3. Did Appellant's absence during a critical stage of the proceedings — when the court responded to a jury request to have the written statement of co-defendant McLaughlin sent back to it during deliberations — violate due process of law, and constructively deny counsel at a critical stage of the proceedings?

4. Was Appellant's waiver of his right to testify knowing, intelligent and voluntary, given the brevity of counsel's consultation with [Appellant] at the time the waiver occurred and when the record shows no prior discussions between counsel and Appellant[,] and was trial counsel ineffective for failing to insure that Appellant was properly advised and had adequate time to consider this critical question?

5. Was trial counsel ineffective for failing to mount a mere presence defense?

6. Did the PCRA court err in denying the [PCRA p]etition without a hearing when Appellant presented disputed material facts?

Appellant's Brief at 1-2 (unnecessary capitalization omitted).

## Analysis

Before delving into Appellant's issues, we recognize:

[O]ur standard of review from the denial of a PCRA petition is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error. The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions.

*Commonwealth v. Sandusky*, 203 A.3d 1033, 1043 (Pa. Super. 2019)

(cleaned up).

Further, as Appellant's issues allege ineffective assistance of counsel,

we acknowledge:

> [T]o establish a claim of ineffective assistance of counsel, a defendant must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. The burden is on the defendant to prove all three of the following prongs: (1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.

> We have explained that

>> a claim has arguable merit where the factual averments, if accurate, could establish cause for relief. Whether the facts rise to the level of arguable merit is a legal determination.

>> The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they effectuated his client's interests. We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.

>> Prejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

> Boilerplate allegations and bald assertions of no reasonable basis and/or ensuing prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective. Moreover, a failure to satisfy

any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness.

*Id.* at 1043-44 (cleaned up).

**First Issue: Counsel's Failure to Obtain Medical Records**

In Appellant's first issue, he argues his trial counsel was ineffective for failing to obtain Mr. Martella's medical records from Roxborough Hospital (hereinafter, "Roxborough records"), where Mr. Martella was first taken after the home invasion before being transferred to Temple Hospital. Appellant acquired the Roxborough records during the litigation of his instant petition, and had them examined by Mark Winther, M.D. Dr. Winther then submitted an affidavit, which Appellant attached to his amended PCRA petition. In the doctor's affidavit, he stated he had reviewed the Roxborough records, as well as the records from Temple Hospital and Mr. Martella's nursing home, the police and EMS reports from the home invasion, and the notes of testimony from Appellant's trial on May 21, 2019, which was the day Dr. Hood testified. *See* Amended PCRA Petition, 8/6/23, at Attachment (Winther Report) ¶ 18. Based on these documents, Dr. Winther rendered several opinions, two of which Appellant focuses on herein.

First, Dr. Winther noted:

Dr. Hood, the Forensic Pathologist who testified for the Commonwealth at trial, admitted at trial that he did not review all of Mr. Martella's medical records. As such, he was not aware of Mr. Martella's initial presentation and management at Roxborough Emergency Department. Dr. Hood testified that Mr. Martella was "unconscious when found[,"] that EMS intubated Mr. Martella prior to arrival at Roxborough and thought [Mr. Martella's] hypoxic injury was a result of being beaten and possibly strangled and

unconscious on their arrival, and that Mr. Martella arrived comatose at the hospital.

*Id.* at ¶ 20(A)(iv) (footnoted citations to the record omitted). Dr. Winther then disagreed with Dr. Hood's testimony, opining that when Mr. Martella arrived at Roxborough Hospital, he "was alert, had minimal visible signs of trauma, and his vitals were normal other than a mildly elevated heart rate … and elevated blood pressure…." *Id.* at ¶ 20(B). The doctor further stated, "Mr. Martella was ambulatory at home at the time of EMS evaluation … and his vitals were grossly normal at Roxborough Hospital…." *Id.* at ¶ 20(B)(i). In sum, Dr. Winther claimed "Mr. Martella was alert and conscious[,]" *id.* at ¶ 20(B)(ii); he "was oriented to person and place, but not to time[,]" *id.* at ¶ 20(B)(iii); and his speech "was clear, and he was able to answer questions appropriately," *id.* at ¶ 20(B)(iv).

Second, Dr. Winther opined "that Mr. Martella was over sedated at Roxborough Emergency Department during his evaluation[,] requiring the need to support his ability to breath (*i.e.*[,] ventilate)…." *Id.* at ¶ 20(C)(i). Dr. Winther explained "non-invasive methods of ventilation were not utilized" and, instead, Mr. Martella "was intubated." *Id.* Dr. Winther further opined that, when Mr. Martella was transferred to Temple Hospital, he "experienced a difficult intubation…[,] leading to cardiac arrest requiring three minutes of CPR, which is what more likely than not caused Mr. Martella's hypoxic brain injury." *Id.* at ¶ 20(C)(ii). Dr. Winther elaborated on this opinion, stating:

> [The] Trauma team evaluation at Temple suspected only minor injuries and oversedation from the medications administered as the cause of Mr. Martella's breathing difficulties[,] and [the] staff

at Roxborough['s] … [decision] to intubate Mr. Martella.  As a result, the trauma team recommended weaning him off sedation and removing the breathing tube (extubate) the following day.  In other words, the Temple Trauma team felt the medications Mr. Martella was given caused the need for intubation and not his injuries.  Ear/Nose/throat (ENT) evaluation noted tracheal edema and recommended use of fiberoptics if Mr. Martella were to require intubation again.

*Id.* at ¶ 20(C)(ii)(b).   However, when "Mr. Martella developed difficulty breathing" on September 15, 2017, Dr. Winther noted "ENT's recommendation of fiberoptic intubation was not followed[,] and Mr. Martella experienced a difficult intubation and sustained a cardiac arrest requiring three minutes of CPR."  *Id.* ¶ 20(C)(ii)(d).  Dr. Winther opined:

It is my medical opinion that more likely than not[,] had medical staff at Temple University followed ENT's recommendations to utilize fiberoptics to intubate Mr. Martella, he would not have experienced a difficult intubation and subsequent three-minute cardiac arrest and hypoxic brain injury, which resulted in a complicated hospital course requiring multiple surgical procedures including a feeding tube due to [his] inability to safely eat and handle [his] own oral secretions.  It is the latter that more likely than not … caused recurrent pneumonias[,] which was the ultimate cause of death of Mr. Martella on [March 15, 2018].

*Id.* ¶ 20(C)(ii)(g).

Appellant now argues that Dr. Winther's opinion, based on the Roxborough records, demonstrates he was not the "but for" cause of Mr. Martella's death.  He explains:

The principles of causation are codified at 18 Pa.C.S.[] § 303.  There are two prongs to causation relevant to the facts of this prosecution.  First, section 303(a)(1) sets forth a "but for" test:

(a) General rule.--Conduct is the cause of a result when:

(1) it is an antecedent but for which the result in question would not have occurred; and

- 10 -

(2) the relationship between the conduct and result satisfies any additional causal requirements imposed by this title or by the law defining the offense.

**See** Commentary to 18 Pa.C.S.[] § 303 (Subsection (a)(1) "establishes the 'but-for' test of causation.")

Subsection (b)(2) of [section] 303 states:

(b) Divergence between result designed or contemplated and actual result.--When intentionally or knowingly causing a particular result is an element of an offense, the element is not established if the actual result is not within the intent or the contemplation of the actor unless:

[***]

(2) the actual result involves the same kind of injury or harm a[s] that designed or contemplated and is not too remote or accidental in its occurrence to have a bearing on the actor's liability or on the gravity of his offense.

Thus, pursuant to subsection (b)(2), when a defendant acts "intentionally or knowingly" — as was the allegation against Appellant [—] causation's second prong permits culpability when the act committed by the defendant "sets off a chain of events from which in the common experience of mankind the result **is natural or reasonably foreseeable**," Commentary to 18 Pa.C.S.[] § 303. According to the text of (b)(2), culpability is only then assigned if the result was not **"too remote or accidental"** to place blame on Appellant for the death.

Whether the medical misadventure described by Dr. Winther, but ignored by Dr. Hood, was "natural or foreseeable" or "too remote or accidental" to impose liability on Appellant for Mr. Martella's death, **was a question of fact for the jury**. **Commonwealth v. Hicks**, 353 A.2d 803, 805 (Pa. 1976) ([stating] "causation is an issue of fact for the jury to decide"); **Commonwealth v. Kostra**, 502 A.2d 1287, 1289 (Pa. Super. 1985) (same); **see also Commonwealth v. Brown**, 185 A.3d 316, 340 (Pa. 2018) ([declaring] "the Commonwealth must prove causation, like every element of a crime, beyond a reasonable doubt") [()quoting **Commonwealth v. Ilgenfritz**, 353 A.2d 387, 390 (Pa. 1976)[)]. Because causation is an element that must be established beyond a reasonable doubt, trial counsel's failure to obtain and utilize the

Roxborough records to show that his death was not foreseeable or natural, was ineffective.

Appellant's Brief at 21-22 (some formatting altered; emphasis in original).

In attempting to satisfy the prongs for proving an ineffectiveness claim, Appellant contends "there is arguable merit to [his] contention that trial counsel should have secured the [Roxborough] records to refute the Commonwealth's causation theory. Since counsel did not have the records, there can be no reasonable basis for not [obtaining] them." *Id.* at 26. Additionally, Appellant maintains he was prejudiced by counsel's failure to acquire the Roxborough records:

> As noted, causation is always a jury question. ***Given that Dr. Hood never reviewed the Roxborough [r]ecords, he was not aware of the alternative causation theory presented by Dr. Winther***. Given the serious question about causation, trial counsel was obliged to secure all of the records relevant to Mr. Martella's death and to provide them to an expert. Indeed, "Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." ***Hinton v. Alabama***, 571 U.S. 263, 273 (2014).
>
> Notably, the Commonwealth in the PCRA [c]ourt did not even attempt to refute Dr. Winther's medical opinion by proffering an opinion from Dr. Hood stating, in effect, that after reviewing the Roxborough records, he stood by his trial testimony related to causation. That silence speaks loudly.

*Id.* at 26-27 (emphasis added).

Having carefully reviewed the certified record, including Dr. Winther's affidavit attached to Appellant's amended petition, we conclude Appellant has not demonstrated counsel had no reasonable basis for not obtaining the Roxborough records, or that he was prejudiced by his counsel's failure to do

so. Notably, Dr. Winther's opinion was **not** based **only** on his review of the Roxborough records; instead, Dr. Winther also assessed the records from Temple Hospital and the nursing home, the police and EMS reports following the home invasion, and the notes of testimony from the trial on May 21, 2019. Appellant does not dispute that defense counsel, and Dr. Hood, had all the records Dr. Winther reviewed, except for the Roxborough records. **See** N.T. Trial, 5/21/19, at 109 (Dr. Hood's testifying he reviewed the police report, the "entire massive medical record" from Temple Hospital, and the "nursing home record"). Indeed, defense counsel and Dr. Hood possessed **3,154 pages** of Temple Hospital medical records. **See id.** at 131. Additionally, defense counsel obviously heard all the testimony proffered on May 21, 2019, including Dr. Hood's.

As set forth above, Dr. Winther ultimately opined that Mr. Martella's hypoxic brain injury, which ultimately caused his death, was due to the fact that staff at **Temple Hospital** had not followed the "ENT's recommendations to utilize fiberoptics to intubate Mr. Martella[,]" which led to the "difficult intubation and subsequent three-minute cardiac arrest and hypoxic brain injury…." Amended PCRA Petition at Attachment (Winther Report) ¶ 20(C)(ii)(g). Dr. Winther clearly stated in his report that it was this difficult intubation and cardiac arrest **at Temple Hospital** "that more likely than not … caused recurrent pneumonias which was the ultimate cause of death of Mr. Martella on [March 15, 2018]." **Id.**; **see also id.** at ¶ 20(C) ("The cardiac arrest and subsequent hypoxic brain injury more likely than not[] was the

direct cause of Mr. Martella's complicated hospital course requiring multiple surgical procedures including a feeding tube due to his inability to safely eat and handle his own oral secretions."). Appellant does not dispute that defense counsel, and Dr. Hood, had the records from Temple Hospital, which detailed this incident.

Although Appellant insists "Dr. Winther's opinion about the problematic Temple intubation was simply a continuation of the inappropriate Roxborough sedation and intubation" and, therefore, his attorney was ineffective for not obtaining the Roxborough records, this argument is unconvincing. Appellant's Reply Brief at 7. Again, in Dr. Winther's report, he stated the

> [t]rauma team evaluation at Temple suspected only minor injuries and **oversedation** from the medications administered as the cause of Mr. Martella's breathing difficulties and **[the] staff at Roxborough['s] ... deci[sion] to intubate Mr. Martella**. As a result, the trauma team recommended weaning him off sedation and removing the breathing tube (extubate) the following day. **In other words, the Temple Trauma team felt the medications Mr. Martella was given caused the need for intubation and not his injuries.**

Winther Report at 9 (emphasis added). **See also** Appellant's Brief at 18-19 (quoting this language from Dr. Winther's report). Thus, Dr. Winther's report indicates **the records from Temple Hospital** contained the information about Mr. Martella's over-sedation and intubation at Roxborough Hospital.

Moreover, to the extent Appellant contends the Roxborough records would have revealed to defense counsel the inaccuracy of Dr. Hood's testimony that Mr. Martella was unconscious when found, our review of the record shows this fact was known to defense counsel through the testimony

of the responding police officers. For instance, Officer Durkin was the first officer on the scene and testified Mr. Martella answered the door. *See* N.T. Trial, 5/21/19, at 196. Although Officer Durkin also testified that when paramedics arrived, Mr. Martella was "very uncomfortable" and was having breathing issues, his testimony clearly indicated Mr. Martella was conscious at that point. *Id.* at 209. Moreover, on cross-examination, Officer Durkin confirmed Mr. Martella was coherent and understood when the officer asked him if he was alright. *Id.* at 214.

Similarly, Officer Sudler, who was the second responding officer, testified Mr. Martella "appeared fine[,]" and was standing and walking around, when the officer first arrived at the house. *Id.* at 223. However, after a few minutes, the officer could "tell that something was starting to [become] wrong with [Mr. Martella]." *Id.* at 222-23. Officer Sudler explained that Mr. Martella "started feeling on his chest, [and] he started turning pail [*sic*]." *Id.* at 223. Officer Sudler then "called for a medic unit over police radio[,]" *id.*, and an ambulance arrived "no more than five minutes" later. *Id.* at 224.

From this testimony, it was apparent to defense counsel that Mr. Martella was not unconscious when found, as Dr. Hood had testified. Additionally, the record reveals defense counsel and Dr. Hood both possessed the information about Mr. Martella's over-sedation and intubation at Roxborough Hospital, as it was contained in the Temple medical records. They also knew about the improper intubation and cardiac arrest at Temple Hospital, which Dr. Winther opined was the ***direct cause*** of Mr. Martella's

hypoxic brain injury and, ultimately, his death. Thus, Appellant has not proven the Roxborough records would have revealed anything to defense counsel or Dr. Hood that was not already apparent via the Temple medical records, police and EMT reports, or testimony offered at trial. As such, Appellant cannot demonstrate counsel acted unreasonably by not also obtaining the Roxborough records, or that counsel's failure to do so caused him prejudice.[1] Accordingly, no relief is due on Appellant's first issue.[2]

### Second Issue: Counsel's Failure to Introduce DNA Results

Appellant next contends his "counsel was ineffective for failing to introduce exculpatory DNA results." Appellant's Brief at 31 (emphasis and

_____

[1] As the Commonwealth stresses, Appellant "did not raise a claim that counsel was ineffective for failing to use the Temple records — to which he had full access at trial — in some alternative manner." Commonwealth's Brief at 17 n.5. He also makes no argument his counsel was ineffective for failing to recall Dr. Hood to the stand to challenge his testimony that Mr. Martella was unconscious when found, after the testimony by Officers Durkin and Sudler made it clear Mr. Martella was awake and responsive at that time. To the extent Appellant is unhappy his defense counsel did not retain an expert, such as Dr. Winther, to offer an opinion to refute Dr. Hood's testimony regarding the cause of Mr. Martella's hypoxic brain injury, Appellant did not raise this claim below or meaningfully develop any such argument on appeal.

[2] We recognize the PCRA court rejected Appellant's ineffectiveness claim for a different reason, concluding that even if "Mr. Martella received deficient care at Roxborough Hospital, that would not be likely to change the jury's finding of causation, since it would not have played 'such an independent, important, and overriding' role in bringing about Mr. Martella's death, compared with the role of [Appellant]." PCO at 8 (citing *Commonwealth v. Paolello*, 665 A.2d 439, 453 (Pa. 1995)). However, "this Court may affirm the decision of the PCRA [c]ourt if it is correct on any basis." *Commonwealth v. Hutchins*, 760 A.2d 50, 54 (Pa. Super. 2000) (citing *Commonwealth v. Pursell*, 749 A.2d 911, 917 (Pa. 2000); *Commonwealth v. Ahlborn*, 683 A.2d 632, 641 n.14 (Pa. Super. 1996)).

unnecessary capitalization omitted).   As context for this claim, Appellant explains that at trial, a forensic scientist, Brittney Rehrig, testified she conducted a DNA analysis on wire cutters and the tape used to restrain Mr. Martella.  *Id.*  She testified "the wire cutters had DNA originating from at least two people, a male and a female[,]" and "[t]he tape had DNA originating from at least three people, at least one of whom was male."  *Id.*  Her testimony indicated Mr. Martella was likely one of the three people whose DNA was found on the tape.  *Id.*  Additionally, her "results excluded [Appellant] as a contributor to the DNA on both objects." *Id.* (emphasis omitted).

Ms. Rehrig further testified she was not able to analyze if Appellant's co-conspirator, McLaughlin, was a contributor to the DNA found on either object "because no DNA was detected from his initial swab."  *Id.* at 32.  However, police subsequently obtained a usable buccal swab from McLaughlin.  While testing of that DNA was inconclusive on whether it matched the DNA on the wire cutters and tape, "this subsequent analysis showed that it was far more likely that [the DNA] originated from [McLaughlin] and not Appellant."  *Id.*

Although defense counsel was provided these supplemental results in discovery, he "never brought it up on cross[-]examination nor sought to introduce the results."  *Id.* at 33.  Appellant argues this constituted ineffectiveness.  He insists "in a case that depended largely on McLaughlin's blame-spreading implication of Appellant, there is a reasonable probability that this additional exculpatory evidence would have made a difference in the outcome."  *Id.*  More specifically, Appellant stresses "McLaughlin testified at

- 17 -

trial that [McLaughlin] choked and tied up Mr. Martella by himself...." *Id.* Because "[c]ounsel was arguing that McLaughlin's trial testimony was accurate and his police statement [implicating Appellant] was not[,[3]]" Appellant avers that the "DNA evidence supporting the testimony and contradicting the police statement[] would have been highly relevant to support the defense position that McLaughlin's exculpatory testimony was correct." *Id.* at 33-34.

In response, the Commonwealth concludes Appellant has not demonstrated he was prejudiced by counsel's failure to introduce the supplemental DNA results. It avers that, because Appellant

> was on trial for committing crimes with McLaughlin — and [Appellant] had already been excluded as a source of DNA — the fact McLaughlin's DNA would be on those items was virtually a foregone conclusion. Indeed, McLaughlin himself testified at trial that he bound the victim with tape. He also consistently maintained, both at trial and in his pre-trial statement, that he had cut the phone lines.

Commonwealth's Brief at 20 (citation to the record omitted). The Commonwealth also stresses "the question of who taped the victim or cut the

---

[3] At trial, McLaughlin testified he was "under the influence" and could not recall various details about the home invasion. N.T. Trial, 5/22/19, at 24, 38. Accordingly, he was confronted with the statement he provided to police several days after the incident, in which he said he and Appellant had committed the home invasion together, and Appellant tied up Mr. Martella. *Id.* at 41. McLaughlin testified he could not recall telling this to police. *Id.* at 42. McLaughlin also told police Appellant had choked and hit Mr. Martella, *id.* at 46, but testified at trial that was "not what happened." *Id.* Instead, McLaughlin testified he alone had choked and bound Mr. Martella with tape. *Id.* at 47.

phone lines was largely beside the point[,]" as Appellant "was convicted of *conspiracy* and *second-degree* murder." **Id.** at 21 (emphasis in original). Thus, Appellant "was liable for crimes committed in furtherance of the conspiracy[,] regardless of whether he or McLaughlin had performed them." **Id.** (citing, *inter alia*, **Commonwealth v. Lambert**, 795 A.2d 1010, 1016-17 (Pa. Super. 2002) (*en banc*) ("The general rule of law pertaining to the culpability of conspirators is that each individual member of the conspiracy is criminally responsible for the acts of his co-conspirators committed in furtherance of the conspiracy. … All co-conspirators are responsible for actions undertaken in furtherance of the conspiracy regardless of their individual knowledge of such actions and regardless of which member of the conspiracy undertook the action.") (citation omitted)).

The PCRA court rejected Appellant's ineffectiveness claim, stating, "[s]ince the DNA analysis from the wire cutters and tape presented to the jury excluded [Appellant], and since [] McLaughlin testified at trial and admitted to choking and tying up Mr. Martella, any results related to [] McLaughlin that were inconclusive were irrelevant." PCO at 9. Thus, the court determined that, "because the inclusive DNA results regarding [] McLaughlin would not give rise to a reasonable probability of a different outcome in [Appellant's] trial, [Appellant] is not entitled to an evidentiary hearing or a new trial." **Id.**

We agree with the PCRA court and the Commonwealth that Appellant has failed to prove he was prejudiced by counsel's failure to admit into evidence, or question Ms. Rehrig about, the inconclusive DNA results

indicating McLaughlin was likely a contributor of the DNA found on the wire cutters and tape. The jury heard McLaughlin's testimony that it was him, and not Appellant, who bound Mr. Martella with tape and used the wire cutters to cut the phone lines. *See* N.T. Trial, 5/22/19, at 48-49 (McLaughlin's testifying he cut the phone lines); *id.* at 91-91 (McLaughlin's admitting he taped Mr. Martella's "hands and his mouth"). The jury also heard that Appellant was excluded as a contributor to the DNA found on those items. Accordingly, the supplemental DNA results showing McLaughlin was likely a contributor to the DNA found on the wire cutters and tape was cumulative of evidence already presented to the jury. Moreover, to the extent the results would have bolstered the credibility of McLaughlin's testimony that he — and not Appellant — tied up the victim, Appellant has not demonstrated it would have changed the outcome of his trial. We agree with the Commonwealth that even if the jury believed McLaughlin's trial testimony, Appellant is still responsible, as a co-conspirator, for McLaughlin's actions of binding the victim. *See Lambert*, *supra*. Thus, we are unconvinced by Appellant's argument that the supplemental DNA results would have changed the outcome of his trial, had his attorney presented that evidence to the jury.

### Third Issue: Counsel's Failure to Ensure Appellant's Presence

In Appellant's third claim, he argues he "was deprived of his right to be present during a jury question as well as to be included in the decision-making about a pivotal point in juror deliberations." Appellant's Brief at 34. Specifically, "[d]uring deliberations, the jury submitted a question to the court

asking if it could review McLaughlin's prior written statement to police. Counsel waived [Appellant's] presence without consultation and agreed to allow the jury to see the statement." *Id.* Appellant insists counsel's decision "denied [him] his due process right to be present at a critical stage of the proceedings" and "also amounted to a functional denial of his Sixth Amendment right to counsel[,] requiring a presumption of prejudice." *Id.* at 35. Appellant further contends he was prejudiced by counsel's decision because the jury should not have been permitted to review McLaughlin's statement pursuant to Pa.R.E. 803.1, the comment to which states, "If admitted, the memorandum or record may be read into evidence and received as an exhibit, but may be shown to the jury only in exceptional circumstances or when offered by an adverse party." *Id.* at 36 (quoting Pa.R.E. 803.1 Comment). Because "[n]either of these exceptions were present, yet counsel conceded [to the jury's receiving McLauglin's statement] anyway[,]" Appellant insists counsel did not have any "sound reason for agreeing to permit the jury to take out McLaughlin's statement." *Id.*

The Commonwealth responds no relief is due pursuant to our Supreme Court's decision in *Commonwealth v. Williams*, 9 A.3d 613 (Pa. 2010). There, Willams averred his counsel was ineffective for not objecting "when the judge announced that the jury could review … audiotaped testimony in private because Pa.R.Crim.P. 602 gives a criminal defendant an unqualified right to be present at every stage of the trial." *Id.* at 617. The Court agreed with Williams "that the playback of audiotape constituted a stage of the trial, and,

as a result, Rule 602 was violated." *Id.* at 618. Nevertheless, the Court determined prejudice could not be presumed, and Williams could not "prevail on his ineffectiveness claim because he cannot show actual prejudice...." *Id.* at 618-19. The Court reasoned:

> [T]the jury heard an audiotaped recording of one witness's complete trial testimony; no new evidence was submitted, and there was no opportunity for judicial discretion because the judge remained outside the jury room. [Williams'] claim that the jury had "full control" over the technician [playing the recording] and the tape is belied by the record, which indicates that the technician was instructed to maintain control of the tape at all times. The jury had already seen the witness testify in a public forum where it was free to observe the body language of every spectator, and the technician was necessary to ensure that the jury did not attempt to review additional testimony without proper authorization. There is no indication that the technician's presence had any effect on the jury, as [Williams] has not identified any witnesses or evidence establishing that the technician participated in the jury's deliberations or disclosed confidential information, which would warrant an evidentiary hearing. Accordingly, [Williams'] first ineffectiveness claim fails because he has not demonstrated a reasonable probability that the outcome of the trial would have been different if the jury had not reviewed the tape in the deliberation room.

*Id.* at 621.

Here, the Commonwealth insists "the same result is warranted" as that in *Williams*. It explains:

> Even if counsel, after consulting with [Appellant], had objected to the jury['s] seeing McLaughlin's statement, and if counsel had then succeeded in persuading [the trial court] to deny the jury's request, it is highly unlikely that the jury would not have reached the same conclusion as to guilt. Therefore, the grant of a new trial would be clearly inappropriate.

Commonwealth's Brief at 22.

- 22 -

Notably, in his reply brief, Appellant concedes "this Court is bound to follow *Williams*…." Appellant's Reply Brief at 13 n.5.[4] We agree. Our decision in *Williams* compels us to conclude Appellant cannot prove he was prejudiced by counsel's conduct. Even if Appellant should have been present in deciding whether the jury should be permitted to review McLaughlin's police statement, and even if counsel's decision to permit the jury to do so was in error, Appellant has not established the outcome of the proceeding would have been different had the jury *not* reviewed that statement. As the Commonwealth observes, "McLaughlin was questioned at length about his statement to the police. The statement was read to the jury twice and admitted into evidence as an exhibit." Commonwealth's Brief at 21 (citing N.T. Trial, 5/22/19, at 24-64; *id.* at 232-37; N.T. Trial, 5/23/19, at 41). Thus, as in *Williams*, no new evidence was submitted to the jury when it was permitted to review McLaughlin's police statement. Furthermore, Appellant does not explain any specific way in which he was prejudiced by the jury's reviewing that document, other than to generally allege it "was inculpatory and contradicted the substance of [McLaughlin's] in-court testimony that he acted alone." Appellant's Brief at 36. This is not sufficient to convince us the jury's verdict would have been different, but for its review of McLaughlin's

_____

[4] Appellant argues, however, the *Williams* decision "makes no sense when trial counsel fails to object, thus rendering this claim unreviewable at any time absent a showing of prejudice." Appellant's Reply Brief at 13. He states he is raising this claim in order "to preserve it for potential further review." *Id.* at 13 n.5.

statement to police. We also agree with the Commonwealth that Appellant's claim he was effectively denied his right to counsel "makes no sense[,]" as Appellant "*was* represented by counsel, who was present, when the court considered the jury's request to review the statement." Commonwealth's Brief at 23 (emphasis in original). Accordingly, no relief is due on Appellant's third ineffectiveness claim.

**Fourth Issue: Counsel's Failure to Consult**

Next, Appellant maintains his trial counsel acted ineffectively by failing to adequately consult with him regarding his decision not to testify, thus rendering his waiver of that right not knowing, intelligent, or voluntary. Appellant points out that, "[w]hen the [c]ourt first raised the question of whether [he] would testify, [his attorney] responded[,] 'I'll need some time in the booth with him.'" Appellant's Brief at 38 (citing N.T. Trial, 5/23/19, at 43). According to Appellant, "[t]his shows that up to that point, [counsel] had not adequately discussed this critical decision with [Appellant]." *Id.* He then stresses that, based on the timing of the recess for counsel to talk to Appellant about his decision to testify, the conversation "could not have lasted more than 30 minutes, and likely lasted less time," considering other factors Appellant cites, including "the need to have [Appellant] brought up from the basement detention area…." *Id.* at 39. Appellant insists "this period of less than thirty minutes to discuss and decide [was] not adequate to demonstrate a knowing waiver of a critical constitutional right." *Id.* at 39-40 (citation omitted). Appellant also concludes the validity of his waiver of that right was

not established simply because he answered, "yes," when asked, during the colloquy on his waiver, whether he "had a full and fair chance to talk to [his] lawyer about" his decision not to testify. *Id.* at 40 (quoting N.T. Trial, 5/23/19, at 47). He maintains "[i]t should not be left to a criminal defendant to know to bring up such an argument during a colloquy, when the post-conviction records show[], at most, a brief discussion of this important question was all that was conducted by trial counsel." *Id.*

Again, no relief is due. As the Commonwealth aptly points out, in *Commonwealth v. Nieves*, 746 A.2d 1102 (Pa. 2000), our Supreme Court explained:

> The decision of whether or not to testify on one's own behalf is ultimately to be made by the defendant after full consultation with counsel. In order to sustain a claim that counsel was ineffective for failing to advise the appellant of his rights in this regard, the appellant must demonstrate either that counsel interfered with his right to testify, or that counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf.

*Id.* at 1104 (internal citations omitted).

Instantly, Appellant does not allege his trial counsel provided advice that was unreasonable or incorrect during their consultation about his decision whether to testify. He also does not claim counsel did anything to interfere with his right, aside from failing to adequately consult with him about the decision. However, Appellant does not identify any way in which he misunderstood what he was doing by waiving that right, or allege he was confused or misled. Indeed, the record of his colloquy waiving his right to

testify would belie any such claim. ***See*** N.T. Trial, 5/23/19, at 44-48. In particular, the court fully explained to Appellant his constitutional right to testify or remain silent. ***Id.*** at 45. Appellant indicated he understood his rights and never expressed confusion or questions. ***Id.*** at 45-46. Moreover, the court explicitly informed Appellant that once he waived his right to testify, he would not "be able to come back at any later time after the trial is over and say [he] wanted to testify[,] or ***[he] didn't get enough time to talk to [his] lawyer about it***, [or] … enough chance to consider it, [or claim] the judge didn't explain [his] rights to [him]." ***Id.*** at 45 (emphasis added). Appellant stated he understood. ***Id.*** at 46. Given this discussion, which preceded Appellant's confirmation that he "had a full and fair chance to talk to [his] lawyer about" his decision not to testify, ***id.*** at 47, we conclude Appellant has not established arguable merit to his claim counsel failed to fully consult with him and his waiver was invalid.

**Fifth Issue: Counsel's Failure to Argue Mere Presence Defense**

Next, Appellant contends his counsel was ineffective for failing "to mount a mere presence defense." Appellant's Brief at 41 (unnecessary capitalization and emphasis omitted). More specifically, he argues:

> Counsel did not present a cogent theory of mere presence, despite the significant evidence that could have supported that defense. McLaughlin's initial police statement constituted a classic example of a perpetrator who, having been implicated in the offense, sought to lessen his culpability by spreading blame. This could have [been,] and in fact was[,] argued to the jury. McLaughlin's in-court exculpatory testimony gave counsel the perfect opportunity to argue mere presence, as McLaughlin admitted that he acted alone and without Appellant's knowledge. The mere

presence theory was consistent [with] Appellant's police statement.[5] It was also strongly supported by his DNA exclusion from the tape used to bind Mr. Martella, which McLaughlin claimed Appellant did[] in his police statement. This defense would have served to offer an innocent explanation of the fingerprints in the victim's car, and the video evidence showing two men entering it. Aside from McLaughlin's out-of-court police statement, there was no other evidence directly placing Appellant inside of the Martella home, and, to the contrary, [Rosemary] Martella never saw Appellant in the home.

*Id.*

In rejecting this claim, the PCRA court stressed:

The record establishes that [Appellant's] trial counsel did, in fact, put forth a mere presence defense. Specifically, defense counsel argued to the jury that "mere presence is not enough for [the jury] to convict anybody," and that the judge would instruct them that "mere presence and association and knowledge is not enough for [the jury] to find anybody guilty beyond a reasonable doubt." N.T. [Trial,] 5/23/[]19[,] at 114. No relief is due.

PCO at 10.

The record supports the court's opinion. In full, trial counsel's closing argument regarding a mere presence defense was as follows:

---

[5] Although Appellant does not explain what he told police in this statement, the Commonwealth summarizes:

On September 20, 2027, [Appellant] gave a statement to police. In it, he denied knowingly participating in any crime[, b]ut he admitted to being inside the Martella residence with McLaughlin and seeing "the old man" with his mouth and body bound in duct tape. According to [Appellant], McLaughlin then "slammed him into a wall and he fell" and "had blood coming from his neck." [Appellant] also stated that McLaughlin told him to "make sure the old man doesn't try to get a phone" and that he left with McLaughlin in a Kia.

Commonwealth's Brief at 6 (citations to the record omitted).

[Defense Counsel:] And, by the way, mere presence is not enough for you to convict anybody.  And it's not enough for you to infer that simply because [Appellant was] associated with [] McLaughlin that he's guilty of a crime because mere association is not enough for you to convict anybody of a crime.

Listen very carefully when the judge instructs you, it goes by really quick, but he's going to tell you that mere presence and association and knowledge is not enough for you to find anybody guilty beyond a reasonable doubt.

We don't have a witness that puts my client inside of the house. Rosemary [Martella] only sees one person.  That's the evidence in the case.

We know that [] McLaughlin committed a burglary and a robbery at that house on a prior occasion.  He pled guilty to that crime in addition to the crimes that he committed on September 13th. That first burglary happened on a prior occasion.  We don't have any identification from the video that [it] was [Appellant] on the video[,] and we don't have any proof from the video that there were actually two people in the house.

We don't have any proof that [Appellant] was actually in the car on September 13th because we have another person's print inside of the car as well….

Whatever it was, whatever happened, we can't come to the conclusion[,] other than through [] McLaughlin's ridiculous testimony here in court, [and] his ridiculous statement to the detectives when they arrested him, … that [Appellant] participated in this crime and he conspired with him or that he acted as an accomplice.

N.T. Trial, 5/23/19, at 114-15.

Although Appellant acknowledges counsel did assert a mere presence defense, he contends it was an "afterthought argument" that "not only failed to put forth this colorable defense, but [also] signaled to the jury that counsel did not believe there was merit to the defense."  Appellant's Brief at 42. Appellant insists

a fulsome "mere presence" defense would have taken advantage of a number of facts that showed that to be the case: the DNA evidence; McLaughlin's exculpatory in-court testimony; a challenge to the validity of his inculpatory out-of-court testimony; and [Rosemary] Martella never saw Appellant in the home.

*Id.* at 43.

Appellant's argument is meritless. As set forth above, counsel did point out to the jury that Rosemary Martella did not see Appellant in the house. Counsel also stressed McLaughlin had alone robbed the Martella home on a previous occasion. He also argued there was no proof Appellant was in the house, aside from McLaughlin's testimony and his prior statement to police, which counsel insisted were "ridiculous." N.T. Trial, 5/23/19, at 115. Given these statements by counsel, Appellant has not demonstrated arguable merit to his claim counsel failed to present a mere presence defense. He has also failed to elaborate on exactly what counsel should have said to further flesh out this defense. Accordingly, Appellant has not demonstrated the outcome of his trial would have been different had counsel done so. Consequently, this ineffectiveness claim also fails.

**Sixth Issue: Court's Failure to Conduct Hearing**

Finally, Appellant cursorily contends the PCRA court erred by failing to conduct an evidentiary hearing. Appellant maintains his "case is far from borderline" because "[h]e pled claims and presented documents showing that if the facts are true, he would be entitled to the relief he seeks." Appellant's Brief at 44. However, Appellant does not identify any specific issues of material fact which warrant a hearing. As this Court has made clear,

> [t]here is no absolute right to an evidentiary hearing on a [PCRA] petition, and if the PCRA court can determine from the record that no genuine issues of material fact exist, then a hearing is not necessary. To obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing.

*See Commonwealth v. McCready*, 295 A.3d 292, 298 (Pa. Super. 2023) (citations omitted). Given our conclusion that each of Appellant's ineffectiveness claims fails for the reasons set forth above, he has not shown any genuine issues of material fact exist. Thus, the court did not err in dismissing his petition without a hearing.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/7/2026